J-S05030-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF P.J.S., JR. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: P.S., SR. | : | No. 1192 WDA 2014 |

Appeal from the Order Entered June 23, 2014,
In the Court of Common Pleas of Erie County,
Orphans' Court, at No. 3A in Adoption 2014.

BEFORE:  DONOHUE, SHOGAN, and STABILE, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED MARCH 04, 2015**

P.S., Sr. ("Father") appeals from the order entered June 23, 2014, which granted the petition to terminate Father's parental rights to his son, P.J.S., Jr. ("Child"), born in October of 2012.  Appellate counsel has filed a petition to withdraw his representation and a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009), which govern withdrawal from representation on direct appeal.[1]  Appellant has filed a response to counsel's petition to withdraw. We grant counsel's petition to withdraw and affirm the order terminating Father's parental rights.

---

[1] This Court extended the **Anders** principles to appeals involving the termination of parental rights in **In re V.E.**, 611 A.2d 1267, 1275 (Pa. Super. 1992).

Child was removed from the care and custody of Father and T.N.S. ("Mother")[2] on June 24, 2013, and adjudicated dependent on July 1, 2013. The juvenile court held a dispositional hearing on August 9, 2013. At that time, Erie County Office of Children and Youth ("ECOCY") had established a permanency plan for Father, but the juvenile court found aggravated circumstances based on the termination of Father's parental rights to another child in January of 2013, and determined that ECOCY need not provide Father services. N.T., 6/20/14, at 12. Child's initial permanency hearing review occurred on December 13, 2013, and the permanency goal for Child was changed to adoption at that time.

On January 9, 2014, the ECOCY filed a petition to terminate the parental rights of Father, who is incarcerated, and Mother pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b). At that time, Child resided with B.S. and E.S., his maternal grandparents ("Maternal Grandparents"), where he had lived with J.B.S.-G. since their removal from the care and custody of Mother and Father in June of 2013. The orphans' court held an evidentiary hearing on June 20, 2014.

---

[2] Mother's parental rights were previously terminated by consent in March 2014. N.T., 6/20/14, at 3. Mother has a second child, J.B.S.-G, born in November of 2010, who also was a subject of the underlying case. The termination of the parental rights of J.B.S.-G.'s father, L.G., was before the lower court at the instant termination hearing on June 20, 2014. We will not discuss that portion of the proceedings except to the extent necessary to review the termination of Father's parental rights to Child.

In an order entered on June 23, 2014, the orphans' court terminated Father's parental rights to Child pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b). On July 21, 2014, Father's appointed counsel filed a notice of appeal and statement pursuant to Pa.R.A.P. 1925(c)(4), indicating his intent to file an **Anders** brief in lieu of a statement of errors complained of on appeal.[3] On July 29, 2014, the orphans' court filed a letter indicating it was not preparing a Pa.R.A.P. 1925(a) opinion in light of the notice of intent to withdraw filed by counsel under Pa.R.A.P. 1925(c)(4).

On September 25, 2014, Father's counsel filed an **Anders** brief with this Court, and on September 29, 2014, he filed a petition to withdraw representation. Thereafter, Father filed four *pro se* documents with this Court, two on October 2, 2014, one on October 6, 2014, and one on November 26, 2014, which we will treat as his response to the **Anders** brief.

Before we address the questions raised on appeal, we first must resolve appellate counsel's request to withdraw. **Commonwealth v. Cartrette**, 83 A.3d 1030 (Pa. Super. 2013) (*en banc*). **See Commonwealth v. Rojas**, 874 A.2d 638, 639 (Pa. Super. 2005) (stating, "When faced with a purported **Anders** brief, this Court may not review the

---

[3] **See In re J.T.**, 983 A.2d 771, 774 (Pa. Super. 2009) (holding that decision of counsel to follow Pa.R.A.P. 1925(c)(4) procedure in termination of parental rights case was proper).

merits of the underlying issues without first passing on the request to withdraw.").

There are procedural and briefing requirements imposed upon an attorney who seeks to withdraw on appeal. The procedural mandates are that counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the brief to [his client]; and 3) advise [his client] that he or she has the right to retain private counsel or raise additional arguments that the [client] deems worthy of the court's attention.

*Cartrette*, 83 A.3d at 1032 (citation omitted).

In addition, our Supreme Court, in *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009), stated that an *Anders* brief must:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361. The Supreme Court reaffirmed the principle that indigents "generally have a right to counsel on a first appeal, [but] . . .

this right does not include the right to bring a frivolous appeal and, concomitantly, does not include the right to counsel for bringing such an appeal." ***Santiago***, 978 A.2d at 357 (citation omitted). The Court stated:

> In the Court's view, this distinction gave meaning to the Court's long-standing emphasis on an indigent appellant's right to "advocacy." . . . As the Court put it, "although an indigent whose appeal is frivolous has no right to have an advocate make his case to the appellate court, such an indigent does, in all cases, have the right to have an attorney, zealous for the indigent's interests, evaluate his case and attempt to discern nonfrivolous arguments."

***Santiago***, 978 A.2d at 357–358 (citation omitted).

Father's counsel has complied with the first prong of ***Santiago*** by providing a summary of the procedural history and facts in the ***Anders*** brief. He has complied with the second prong by referring to any evidence in the record that he believes arguably supports the appeal. Counsel also set forth his conclusion that the appeal is frivolous, and stated his reasons for that conclusion, with appropriate support. Moreover, counsel filed a separate motion to withdraw as counsel, wherein he stated that he made a conscientious examination of the record, and he concluded that the appeal is frivolous. Further, counsel has attempted to identify and fully develop any issues in support of Father's appeal. Additionally, counsel sent a letter to Father, and he attached a copy of the letter to the ***Anders*** brief. Counsel states that he informed Father that he has filed a motion to withdraw and an ***Anders*** brief, and he apprised Father of his rights in light of the motion to

withdraw as counsel. Thus, Father's appellate counsel has satisfied the requirements of **Anders** and **Santiago**. We thus conclude that the procedural and briefing requirements for withdrawal have been met.

In the **Anders** brief, counsel presents the following issues for our review:

> [Father] asserts that [ECOCY] cannot establish grounds for termination under Section 2511(a)(1) as the facts of record do not reveal that he has a settled purpose of relinquishing claim to the child or that he refused or failed to perform parental duties.

> [Father] asserts that the evidence failed to establish grounds for termination under Section 2511(a)(2) as the facts of record do not reveal that his "repeated and continued incapacity, abuse, neglect or refusal caused the [child] to be without essential parental care" and/or that he cannot or will not remedy these conditions.

> [Father] asserts that the evidence failed to establish grounds for termination under Section 2511(a)(5) as the facts of record do not reveal that "the parent cannot or will not remedy those conditions which led to the removal within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child."

> [Father] asserts that the evidence did not establish grounds for termination under Section 2511(b) as the facts do not show that the termination of [Father]'s parental rights was in the child's best interests.

**Anders** Brief at 5.

Collectively, we address whether the orphans' court erred in granting the termination petition because the evidence was insufficient to support the

J-S05030-15

termination. We review an appeal from the termination of parental rights in accordance with the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; [*In re*] *R.I.S.*, 36 A.3d [567,] 572 [Pa. (2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 539 Pa. 161, 650 A.2d 1064, 1066 (1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012) (some internal citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

**Id.** (quoting **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa. Super. 2003)). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

The trial court terminated Father's parental rights under section 2511(a)(1), (2), (5), and (b). We will focus on subsections 2511(a)(2) and (b), which provide as follows:

> **§ 2511. Grounds for involuntary termination**
>
> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

-8-

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.  *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).  The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties.  *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002).

Our Supreme Court set forth our inquiry under section 2511(a)(2) as follows:

> As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent."  If and only if grounds for termination are established under subsection (a), does a court consider "the developmental, physical and emotional needs and welfare of the child" under § 2511(b).
>
> This Court has addressed incapacity sufficient for termination under § 2511(a)(2):
>
>> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity.  The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.
>
> *In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883, 891 (Pa. 1986) (quoting *In re: William L.*, 477 Pa. 322, 383 A.2d 1228, 1239 (Pa. 1978)).

*Adoption of S.P.*, 47 A.3d at 827.

Moreover, our Supreme Court instructed:

> [I]ncarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and . . . the causes of the incapacity cannot or will not be remedied.

*Adoption of S.P*., 47 A.3d at 828.

After re-visiting its decision in **R.I.S.**, regarding incarcerated parents, our Supreme Court stated:

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). *See e.g*. *Adoption of J.J.*, 515 A.2d [883,] 891 [Pa. 1986] ("A parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); [*In re*:] *E.A.P.*, 944 A.2d [79,] 85 [(Pa. Super. 2008)] (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

*Adoption of S.P.*, 47 A.3d at 830–831.

This Court has stated that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *A.L.D.*, 797 A.2d at 337. A parent's vow to cooperate, after a long period of

-11-

uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

At the hearing, ECOCY presented the testimony of Michael P. Davis, a general field agent for the Pennsylvania Board of Probation and Parole who was assigned to Father's case in March 2010. N.T., 6/20/14, at 13–14. Mr. Davis stated that on June 24, 2008, Father was released on parole from a 1999 prison sentence imposed for an aggravated assault conviction in Allegheny County. *Id*. Mr. Davis explained that when Father began his relationship with Mother, and especially when Father consumed alcohol, problems ensued. *Id*. at 14–16.

Mr. Davis testified that upon first discovering alcohol at Father's residence, Father claimed it belonged to Mother. Mr. Davis advised Father, who was required to refrain from consuming alcohol while on parole, that he would sanction Father for a parole violation in the future. N.T., 6/20/14, at 15. Subsequently, the Erie Police Department was twice called to respond to domestic violence between Father and Mother. *Id*. at 16. Mr. Davis stated that he advised Father that the terms of his release on parole prohibited domestic violence and the use and consumption of alcohol. *Id*.

In July of 2013, Father reported to the parole office with a large laceration on his ear and stated that Mother had cut him in a domestic dispute. N.T., 6/20/14, at 17. Mr. Davis testified that he was present at

Child's dependency adjudication hearing, where there was testimony that Father had thrown Mother "through a television set," and Mother had later "cut him in the ear in response." *Id*. at 18. Mr. Davis stated that he gave Father a written instruction not to have any contact, directly or indirectly, with Mother, because of the violent relationship between the couple. *Id*. at 16–17. According to Mr. Davis, the reason for the no contact order was to protect Father from Mother, as Mr. Davis's office had no control over her. *Id*. at 18. Mr. Davis testified that in response to Father's own request, Mr. Davis placed Father into the Independent Living Dual Diagnosis program at Stairways, which included both alcohol and mental health programs. *Id*. at 16–17.

Mr. Davis testified that Father currently was incarcerated as the result of a driving-under-the-influence ("DUI") conviction in Allegheny County, which was a violation of Father's parole. N.T., 6/20/14, at 18–19. Mr. Davis explained that Father had pled guilty to DUI and was sentenced. *Id*. at 21. Father waived a parole revocation hearing and admitted that he had been arrested and convicted of DUI. *Id*. Mr. Davis indicated that he had no knowledge of Father's expected release date from incarceration or whether Father had been evaluated by the parole board. *Id*. at 21–22.

Kerry Sessler, the ECOCY primary caseworker for Child since July 2013, also testified. N.T., 6/20/14, at 24. Ms. Sessler testified that Father

had a prior history with ECOCY in that his parental rights to another child had been involuntarily terminated. *Id*. at 24–25. Ms. Sessler testified that A.C., the mother in the prior case, had a protection-from-abuse ("PFA") order against Father on her behalf and that of their child, and that the prior case involved reports of domestic violence and alcohol abuse, which are the same issues involved in the present case. *Id*. at 25. Ms. Sessler testified that when she assumed Child's case, Father had prior intakes with ECOCY related to domestic violence and alcohol abuse, and he had a prior criminal history. *Id*. at 25–26. Ms. Sessler explained that Father's criminal history included criminal violence in a domestic case. *Id*. at 26.

Ms. Sessler testified that ECOCY did not propose a treatment plan for Father at the dispositional hearing for Child because aggravated circumstances were present. N.T., 6/20/14, at 26. Ms. Sessler explained that as of the goal change hearing in December 2013, Father had not displayed any indication that he had remedied his problems with domestic violence and alcohol abuse. *Id*. at 27. She further stated that Father was incarcerated in August or September 2013, and was incarcerated at the time of the December 2013 hearing. *Id*. Ms. Sessler noted that before he was incarcerated, Father "was on the street," and ECOCY continued to receive reports of domestic violence concerning Father. *Id*. at 28. She testified that on July 2, 2013, Father's car was "shot-up" outside of Mother's apartment,

and Father had arrived at Maternal Grandparents' house at 1:00 a.m., intoxicated, requesting to see Child. *Id*. Police were called, and a police report was filed regarding the incident. *Id*. Ms. Sessler stated that the incidents involving Father and his alcohol abuse continued until he was re-incarcerated. *Id*. At the time that the goal was changed in December 2013, Ms. Sessler testified that Father had not resolved his alcohol abuse or domestic violence issues. *Id*. at 28–29.

Ms. Sessler explained that Child has been placed with J.B.S.-G. at Maternal Grandparents' home since the children's initial placement. N.T., 6/20/14, at 31. Ms. Sessler noted that as of her last involvement with the case, Maternal Grandparents were meeting Child's needs. *Id*. Ms. Sessler described that in June 2014, Child was eighteen months old, and that she had not observed any detrimental effects on Child from not being in Father's presence. *Id*. at 32. Ms. Sessler testified that terminating Father's parental rights would be in Child's best interest, and it would not cause any detrimental effects. *Id*. at 32-33.

Ms. Sessler testified that ECOCY had prepared a permanency plan for reunification with Child but that the court never approved it. That plan included completing domestic violence counseling, therapy, and parenting classes, and completing a drug and alcohol assessment. N.T., 6/20/14, at 40. She stated Father had visitation with Child from the time of the intake

until the dispositional hearing. *Id*. at 41. Ms. Sessler testified that after the dispositional hearing, she explained to Father that ECOCY could not provide visitation at the prison because the agency was not providing services, and that he would have to arrange visitation. *Id*.

ECOCY also presented the testimony of Kim Covatto, Child's permanency caseworker and the caseworker for the family since February of 2014. N.T., 6/20/14, at 89, 92. Ms. Covatto stated that she was working toward finding a permanent resource for Child. *Id*. at 89-90. She testified that Maternal Grandparents were meeting all of Child's medical, emotional, and financial needs. *Id*. at 90. Ms. Covatto stated that Child was twenty months old at the time of the termination hearing, that she had observed him, and that he was able to speak some words. *Id*. Ms. Covatto testified that Child was placed in the custody of ECOCY before he was one year old, and that Father had not seen Child since his incarceration. *Id*. at 90-91. She represented that Father had not contacted her since she was assigned to the case. *Id*. at 91. Ms. Covatto stated that she had not observed any detrimental effect on Child from being separated from Father. *Id*. at 91-92. She testified that the termination of Father's parental rights would be in Child's best interest, and that there would be no detrimental effects on Child. *Id*. at 92.

Upon questioning by the court, Ms. Covatto stated that she based her opinion that the termination of Father's parental rights would be in Child's best interest on Father's past history, his ongoing struggle with domestic violence with Mother, and his impregnating Mother with an additional child, a female infant, so that Father and Mother are still connected. N.T., 6/20/14, at 95. Ms. Covatto emphasized Father's uncertainty regarding his prison-release date, his indication that he will proceed to a half-way house, which will prolong his time for beginning to develop a relationship with Child, and the fact that his parole sentence will not be completed until 2019. *Id*. Moreover, Ms. Covatto explained that the services provided to Father were limited because of his previous involvement with ECOCY regarding domestic violence and alcohol abuse, and he did not remedy those matters during the time that the agency worked with him. *Id*. at 95-96.

ECOCY finally presented, as on cross-examination, the testimony of Father, who was incarcerated but present in the courtroom. N.T., 6/20/14, at 53. Father admitted at the termination hearing that in 1998, he was convicted on charges of aggravated assault, risking a catastrophe, and arson, and the victim was a female friend. *Id*. at 54. Father testified that he was sentenced to serve seven to twenty years in prison, and he was released from prison in 2007. *Id*. He stated that he had been convicted of DUI in Allegheny County, for an offense that occurred in January or February

of 2013, and that Mother had been with him at the time of the offense. *Id*. at 53. Father explained that he was currently incarcerated on a parole violation for leaving the district without a travel pass in relation to the offense in Allegheny County. *Id*. Father testified that he anticipated that he would have served his six-month sentence for his out-of–district violation by August 15, 2014. *Id*.

Father maintained that he became involved with Mother a few years before the hearing. N.T., 6/20/14, at 54–55. Father acknowledged that his parental rights to his son, R., with A.C. were terminated in January of 2013. *Id*. At 55–56. Father denied any allegations of domestic violence and alcohol abuse in his case with R.; rather, he claimed that A.C.'s mother forced A.C. to seek a PFA order against him. *Id*. at 56.

Father admitted that Child and J.B.S.-G. were in the home at the time of the domestic violence in July of 2013. N.T., 6/20/14, at 57–58. Father claimed that he threw Mother into the television set when she destroyed $6,000 worth of his clothing because he would not take her out for her birthday. *Id*. at 58. Father also asserted that when he was stopped by police for the DUI in early 2013, he ran from the car, and the police officers later found he was drunk at the police station. *Id*. at 58. Father admitted appearing at Maternal Grandparents' home in a drunken state in the middle

of the night, that he was incarcerated on August 15, 2013, and he had remained incarcerated since then. *Id*. at 58–59.

Father testified that he had written at least four letters to ECOCY, two dated November 26, 2013, one dated December 31, 2013, and one dated May 16, 2014, in which he asked about Child's welfare and admitted his past mistakes. N.T., 6/20/14, at 59. Father agreed that Child and J.B.S.-G. should not have been present during the incident with the television. *Id*. at 61. He indicated that he planned to obtain his commercial driver's license upon his release from prison and to drive a truck for a private company or the City of Erie. *Id*. Father admitted that he previously had driven a truck for Glenwood Beer, but had lost that job when he showed up intoxicated on the morning following the incident in which his car was shot. *Id*. at 62.

Father expected to be released on parole on August 15, 2014, at the expiration of his six-month prison sentence, but related that his release was not a certainty. N.T., 6/20/14, at 74-75. Father admitted that he would not have served his maximum sentence for the aggravated assault conviction until 2019, but that he had served his three-day sentence for the DUI conviction. *Id*. at 75. Father testified that he was participating in a drug and alcohol awareness class, Alcohol and other Drugs Community House of Change Therapeutic Community program, while incarcerated and attending meetings because he wished to be a good father upon his release. *Id*.

Father testified that he believed Child knows him, although he had not seen Child since July of 2013, when his parole was revoked. *Id*. at 88. Father represented that he visited Child after Child's removal in June of 2013 until his parole was revoked in July of 2013. *Id*.

Upon review, we conclude the evidence at the hearing clearly demonstrated that Father's continued incapacity, abuse, neglect, or refusal to parent could not or would not be remedied. He was incarcerated between 1999 and 2007, before Child was born. Father committed a parole violation and new offense in early 2013, when Child was an infant, which resulted in Father's re-incarceration. The trial court properly considered the history of the case, including Father's neglect as a parent to Child, as evidenced by his continued domestic violence and alcohol-related incidents that resulted in his imprisonment, and determined that Father would not remedy his failure to parent. The trial court also properly considered that Father's parental rights to another child, R., were involuntarily terminated in January of 2013, about the same time that Father committed the DUI and parole violation offenses for which he was re-incarcerated. Father continued to engage in domestic violence with Mother, even while Child and J.B.S.-G. were in the home, sleeping. He also continued to commit alcohol-related offenses that resulted in further incarceration for DUI and a parole violation for the alcohol abuse,

as well as for being outside of the district when not permitted under the terms of his parole.

We discern no reason to disturb the orphans' court's conclusions that ECOCY sustained its burden demonstrating that Father had an incapacity to parent Child. Father was unable to remedy the conditions or causes of his incapacity within a reasonable amount of time, as he had no plan to care for Child upon his release from prison. Although he claimed to have completed an anger-management course in prison, there was no evidence that he had addressed his lack of stable housing or his parenting abilities. Father cannot now shift the blame to ECOCY for his failure to parent Child.

Father's argument regarding 23 Pa.C.S. § 2511(a)(2) essentially asks this Court to make credibility and weight determinations different from those of the orphans' court. While Father may claim to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. **In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010). We stated in **Z.P.** that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." **Id.** at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and

fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

Following our careful review of the record in this matter, we conclude that the orphans' court's credibility and weight determinations are supported by competent evidence in the record. *Adoption of S.P.*, 47 A.3d at 826–827. Accordingly, the orphans' court's determinations regarding 23 Pa.C.S. § 2511(a)(2) are supported by sufficient, competent evidence in the record.

Having determined that the requirements of section 2511(a) are satisfied, we proceed to review whether the requirements of subsection (b) have been met. *In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *Id.* at 1008.

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, 620 A.2d [481,] 485 [(Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of

-22-

permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Our review of the record reveals sufficient evidence from which the trial court properly could have found that there is no bond between Child and Father. We have stated that in conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *Z.P.*, 994 A.2d at 1121. Herein, Ms. Sessler testified that Child had been adjudicated dependent on July 1, 2013, when he was only eight months old. N.T., 6/20/14, at 24. Ms. Sessler testified that Child was one and one-half years old[4] at the termination hearing in June of 2014, and that she had not observed any detrimental effect on Child from the absence of contact with Father. *Id.* at 32. Ms. Sessler stated that terminating Father's parental rights would be in Child's best interest and that there were no detrimental effects to Child from the termination. *Id*. at 32–33.

Child was placed in the custody of ECOCY at only eight months old, and Father had not seen Child since his incarceration in August 2013, when Child was merely ten months old. N.T., 6/20/14, at 90-91. Ms. Covatto testified that Father had not contacted her since she was assigned to the

---

[4] The record reveals that Child was twenty months old at the time of the termination hearing. N.T., 6/20/14, at 90.

case. *Id.* at 91. Ms. Covatto explained that she had not observed any detrimental effect on Child from being separated from Father. *Id.* at 91-92. She testified that the termination of Father's parental rights would be in Child's best interest, and that there would be no detrimental effects to Child from the termination. *Id.*

This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008). In the instant case, Father failed to "exhibit [the] bilateral relationship which emanates from the parent['s] willingness to learn appropriate parenting . . . ." *In re K.K.R.S.*, 958 A.2d 529, 534 (Pa. Super. 2008). The orphans' court properly could have found from the evidence that Father did not put himself in a position to assume daily parenting responsibilities for Child so that he could develop a real bond with Child. Rather, Father continued to engage in domestic violence with Mother and to commit alcohol-related offenses that resulted in further incarceration for DUI and a parole violation for the alcohol abuse, as well as for being outside the district when not permitted under the terms of his parole. *See In re J.L.C.*, 837 A.2d 1247, 1249 (Pa. Super. 2003) ("Once the Father has abandoned

parental control through his own actions, it is not enough for him to 'promise' to do better to regain parental control in the future.").

As there is competent evidence in the record that supports the trial court's credibility and weight assessments regarding Child's needs and welfare, and the absence of any bond with Father, we conclude that Father's appeal lacks merit as to 23 Pa.C.S. § 2511(b). **Adoption of S.P.**, 47 A.3d at 826–827. Accordingly, we affirm the termination decree.

Further, we have reviewed the four documents that Father filed with this Court in response to counsel's **Anders** brief. We have concluded that the orphans' court had sufficient evidence upon which to terminate Father's parental rights, and that the appeal is frivolous. Father's responses do not persuade us to find otherwise. We also observe that although Father raised an ineffective assistance of counsel argument at the commencement of the termination hearing, he ultimately decided to proceed with counsel. N.T. 6/20/14, at 4-8.

We have independently reviewed the record in order to determine whether there are any non-frivolous issues present in this case. **Commonwealth v. Harden**, 103 A.3d 107, 111 (Pa. Super. 2014). Having concluded that there are no meritorious issues, we grant Father's counsel permission to withdraw, and affirm the order terminating Father's parental rights.

Petition to withdraw granted.  Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  3/4/2015